[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11588
_____

D.C. Docket No. 1:14-cr-00029-WLS-3


UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

versus

ROBERT WADE UMBACH,
CHRISTOPHER KINES,

                                        Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(August 30, 2017)

Before WILLIAM PRYOR, MARTIN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Defendants-Appellants Robert Wade Umbach and Christopher Kines are former officers of the Decatur County Sheriff's Office ("DCSO") who appeal their convictions and sentences entered after a jury found them guilty of obstructing a civil-rights investigation conducted by the Federal Bureau of Investigation. For the reasons that follow, we affirm their convictions, vacate their sentences, and remand for resentencing.

## I.

The events leading to Umbach's and Kines's convictions stemmed from an underlying incident involving law enforcement's alleged use of excessive force against Ronnie Aaron Parrish, and Umbach's and Kines's efforts to cover up their and their fellow officer's alleged use of excessive force during that incident. Among Umbach's and Kines's acts in furtherance of their cover-up, they prepared false reports of the incident, testified falsely at Parrish's criminal trial, and gave false statements to the FBI when the FBI investigated. Umbach's and Kines's convictions are based on the false statements they gave to the FBI. But to evaluate the sufficiency of the evidence against Umbach and Kines at their federal trial in this case, we must recount evidence pertaining to all of these events.

## A.

BikeFest is an annual, week-long event held every September in Decatur County, Georgia, during which bands play music, funds are raised for charity, and

2

attendees camp out, cook out, eat, drink, and dance.  On Saturday, September 15, 2012, the last night of BikeFest for the year, a series of altercations occurred, triggering a chain of further events that ultimately led to the prosecution now before us for review.

A party was taking place at a campsite, and one couple at the party, Mandy and Mike Green, began arguing, so they went to talk behind a camper that was parked at the campsite.  Concerned that the argument was escalating, another couple, Gena and Mark West, followed the Greens behind the camper and tried to calm them down.

The Wests then headed back to the party, but as they were walking back, Mark turned around to go and tell Mike one more thing.  Gena tried to stop Mark by touching his chest and talking to him, but Mark persisted.

The Greens ended up disappearing into a recreational vehicle ("RV") at the campsite, but the Wests were still outside when DCSO Deputy Charlie Emanuel spotted them arguing.  Emanuel approached, and while Gena told him that the Greens were in a fight inside of the RV, Mark continued to push his way towards the RV.  Emanuel commanded Mark to step back from the RV and attempted to pull Mark away, but Mark refused to listen and pushed back against Emanuel, so Emanuel grabbed Mark, slung him to the ground, and began to handcuff him.  By

3

that point, Deputy Kines had come over, and he assisted Emanuel in apprehending Mark.

As this struggle unfolded, Ronnie Aaron Parrish, who is Gena's son, was standing nearby. Parrish heard Gena start screaming his name when Emanuel became physical with Mark, and Parrish quickly headed towards the commotion. Before Parrish could get to Mark, however, Parrish was grabbed from behind, and he began struggling to break free.

Parrish did not realize at the time that the individuals who were grappling with Mark on the ground were law-enforcement officers, nor did Parrish know that the people who were restraining him from behind were officers as well. So Parrish kept pushing forward in an attempt to get closer to Mark; Parrish didn't get far, however, because someone jumped on his back, and then two other men, who Parrish also could not tell were officers, blocked his path forward. The officers then pulled him to the ground and attempted to hold him there as he struggled.

As it turns out, among the various officers present, Deputies Umbach and Kines were on the ground restraining Parrish. They were soon joined by Wiley Griffin IV ("Griffin IV"), who was a deputy of the sheriff's office of neighboring Grady County and was also the son of Wiley Griffin III, the DCSO Sheriff (the "Sheriff").

4

While Umbach and Kines were still holding Parrish down, Griffin IV grabbed Parrish by the head, lifted his face up, and forcibly struck Parrish with a flashlight multiple times across the right side of his face, including on his eye. After one of the first strikes, one of the officers involved yelled at Parrish, "Stop trying to get my gun, boy." DCSO Captain Chip Nix, however, was standing nearby, and he testified that he did not observe Parrish trying to reach for any officer's gun and that, given how Parrish was positioned, it did not even seem possible that Parrish could have attempted to grab a gun. Nix later suggested that one of the officers yelled the command out as pretext to make it seem to the crowd of onlookers that Griffin IV's strikes were justified.

Parrish's beaten face was covered in blood and had visible wounds. The officers handcuffed him and took him to the DCSO's command center, a mobile police station that had been set up on the BikeFest campgrounds. Officers at the command center took photographs of Parrish's injuries, got his name, ordered him to report to the DCSO the following Monday morning for an interview, and then let him leave. Parrish's wife picked Parrish up and escorted him to a nearby hospital. Two days later, Parrish was treated by an ophthalmologist, who testified that, at the time of treatment, Parrish suffered, among other ailments, a laceration above his right eye, bruising around his right eye, bleeding within his right eye, lingering pain, and blurred vision.

**B.**

On the Monday following the BikeFest incident, DCSO Captain Elizabeth Croley asked Umbach and Kines each to write his own statement about what he witnessed during the altercation with Parrish.

Umbach's statement tells the following narrative. Before he became involved with Parrish, Umbach was assisting Emanuel with Mark West's arrest. Other deputies arrived, and Umbach asked Croley to hold back Gena West so that Umbach could better help Emanuel in restraining Mark.

Shortly thereafter, Umbach reported, Parrish ran up to Croley and punched her in the chest. Umbach grabbed Parrish from behind and pulled him away from Croley. Next, Kines went over and yelled at Parrish, "Don't grab that gun." And then, together, Umbach and Kines took Parrish to the ground. After that, according to Umbach, "We struggled with Mr. Parrish for a few minutes and I was able to gain control of his left arm while Deputy Kines and other deputies had his right arm." Parrish was then handcuffed, and Umbach and Griffin IV escorted Parrish to Griffin IV's golf cart, which took Parrish to the DCSO command center. Notably, although Umbach's witness statement mentioned Griffin IV, it did not mention the injuries Parrish sustained, let alone the flashlight beating Griffin IV inflicted on Parrish's face.

6

Kines's statement said that his initial purpose in going to the campsite was to help Emanuel with Mark West. Kines assisted Emanuel in handcuffing Mark, and as Kines escorted Mark to a cart, Kines heard Croley yell, "He just hit me." Kines then saw Croley and Umbach struggling with Parrish, and Kines went to help them. Kines wrote,

> The subject was taken to the ground and was on his knees in a kneeling position, and would not comply with demands to put his hands behind his back. Other deputies were assisting as well to subdue the combative subject. I saw the subject reach back and put his right hand on Deputy Umbauch's [sic] service weapon. The subject was finally subdued after numerous defensive tactics were used to gain control of him. We noticed that the subject had injuries to his face so EMS was called to check his injuries.

Unlike Umbach's statement, Kines's statement did indicate that Parrish suffered injuries. But markedly absent from Kines's report was any mention of Griffin IV or the fact that Griffin IV had struck Parrish multiple times with a flashlight.

In addition to collecting witness statements from Umbach and Kines, Croley drafted an incident report on behalf of the DCSO. The report identified Croley, Umbach, Kines, Emanuel, Nix, and Wendell Cofer as the DCSO officers who witnessed the events surrounding Parrish's arrest. The report also listed Robbie Webb, Anthony Farace, and Charles Macon Moore as BikeFest security witnesses and Norma McIntyre as a civilian witness. Croley drafted a narrative at the end of the report in which she detailed the arrests of Mark West and Parrish. The report made no mention of Griffin IV.

7

## C.

On the same day that Croley instructed Umbach and Kines to write witness statements, Parrish and his wife went to the DCSO and asked to see the Sheriff to find out why Parrish had been beaten and whether Parrish had done anything wrong. The Sheriff was unavailable, and although Croley and another deputy offered to speak with Parrish and his wife, the Parrishes declined. Parrish returned a few days later, and this time the Sheriff met with him. Cofer also sat in on that meeting, and during the discussion, Cofer insisted they audio-record their conversation. After refusing to consent, Parrish left the office.

That evening, Parrish received a call from the DCSO. They informed him, for the first time, that he was being charged with two felony offenses: (1) obstruction of justice for obstructing Croley's performance of her duties and for striking her in the chest, and (2) attempting to grab an officer's weapon during arrest.[1]

Parrish maintained that he did not strike Croley or reach for anyone's gun, and he took his case before a state-court jury in February 2013. Umbach, Kines, and Croley testified at the trial. Umbach testified that he believed Kines hit Parrish at the same time that Kines ordered Parrish to let go of Umbach's weapon. For

---

[1] It would eventually come to light at Umbach's and Kines's trial that the DCSO brought these charges against Parrish in retaliation for the fact that he came to complain to the DCSO about how he was treated at BikeFest.

Kines's part, he testified that he used "defensive tactics" to subdue Parrish by striking him "four or five" times in "pressure point[s]" like the jugular vein and carotid artery. Neither Umbach nor Kines nor Croley mentioned in his or her trial testimony Griffin IV's assault on Parrish, and Griffin IV did not testify. The jury convicted Parrish of obstruction of justice by hitting Croley but acquitted him of attempting to grab Umbach's weapon.

## D.

At the time of his trial, Parrish was not aware that the person who struck him with a flashlight was Griffin IV. He learned this a couple months later from Nix when he ran into Nix at a gas station. At that point, Nix was no longer employed with the DCSO, having left in February or March of that year. Prompted by the revelation that Griffin IV was his assailant, Parrish contacted the FBI in August 2013 (about six months after the state-court trial) to report Griffin IV's use of excessive force against him. Some time after that, Parrish also filed a civil suit against Umbach, Kines, Croley, Griffin IV, and the DCSO.

At the FBI, Agent Steve McDermond took on Parrish's case. McDermond opened a civil-rights investigation and contacted Cofer at the DCSO, asking him to send to the FBI the materials relevant to the DCSO's investigation. In response, McDermond received, among other materials, the incident report drafted by Croley; the witness statements of Umbach and Kines; and transcripts of the

9

testimony given at Parrish's state-court criminal trial by Umbach, Kines, and Croley.  McDermond also interviewed Kines and Croley individually at the beginning of November 2013 and Umbach later that same month.

McDermond audio-recorded his interviews with Umbach and Kines.  During the interview with Umbach, Umbach said that he did not see Griffin IV hit Parrish in the face with a flashlight and that he would have seen it if it did happen.  He told McDermond that he saw Griffin IV for the first time during the incident only after Umbach and Kines picked Parrish up from the ground after handcuffing him.  According to Umbach, Griffin IV "actually never laid hands on [Parrish] until [Umbach and Kines] picked [Parrish] up," at which point Griffin IV merely escorted Parrish to a golf cart to be taken to the DCSO command center.  Umbach assured McDermond that "[he] could tell [McDermond] that one hundred percent."  As for the force that was used on Parrish, Umbach said that, "to [his] knowledge," Kines punched Parrish one time.  Umbach asserted that "there is no way anybody else could have d[one] anything" in front of Parrish because Umbach "would have seen it."  Finally, Umbach insisted that to the extent it was suggested that Griffin IV hit Parrish in the face with a flashlight, Umbach "d[id]n't see . . . [how it was] physically possible . . . that could have happened."

In the interview with Kines, Kines told McDermond that, during the incident, he did not see Griffin IV come up and hit Parrish with a flashlight; that

"the only one [he] remembered seeing [was] Umbach"; and that he would "have definitely remembered" seeing someone come up and hit Parrish with a flashlight while he was holding Parrish.  He stated that he was "the only one that [he] kn[e]w of" to strike Parrish and that he "would have seen" if someone else struck him.  As for the force used against Parrish, Kines said that he struck Parrish only once by way of a punch aimed at the temple and that he also tried to do a pressure point on Parrish while holding Parrish's head.

### E.

In July 2014, a grand jury in the U.S. District Court for the Middle District of Georgia returned an indictment against Umbach, Kines, Griffin IV, and Croley, on charges stemming from Griffin IV's beating of Parrish and the subsequent cover-up by Umbach and Kines (among others).  Umbach and Kines were each charged with two offenses.

The first was making a false report in violation of 18 U.S.C. § 1519 by writing a false witness statement for the DCSO case file.  According to the indictment, each man's witness statement was false because it did not mention Griffin IV's beating of Parrish, even though both men knew that to have occurred.

Second, Umbach and Kines were charged with tampering with a witness, victim, or an informant in violation of 18 U.S.C. § 1512(b)(3) by making two false

11

and misleading statements to the FBI: (1) that Griffin IV did not use force against Parrish, and (2) that the only person who hit Parrish was Kines.[2]

The court held a thirteen-day trial, starting on May 21, 2015.  On June 10, 2015, the jury acquitted Umbach and Kines of making a false report in violation of § 1519 but convicted them of tampering with a witness, victim, or an informant in violation of § 1512(b)(3).[3]  The following year, in March 2016, the court sentenced Umbach and Kines to 15 months' imprisonment each.  In calculating each defendant's offense level under the Sentencing Guidelines, the court added a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust.

Umbach and Kines now appeal their convictions and sentences.[4]  Umbach asserts two grounds for reversal: insufficiency of the evidence and sentencing error.  Kines raises numerous grounds: insufficiency of the evidence, sentencing error, jury-instruction error, a number of evidentiary errors, and cumulative error.

## II.

Umbach and Kines argue the evidence is not sufficient to support their convictions under 18 U.S.C. § 1512(b)(3), which makes it a felony to, among other

---

[2] As for Griffin IV, he was charged with deprivation of rights under color of law in violation of 18 U.S.C. § 242 for using unreasonable physical force against Parrish.  Croley was also charged with deprivation of rights under color of law in violation of 18 U.S.C. § 242, but for the separate reason that, in the state-court prosecution of Parrish, Croley withheld material, exculpatory evidence.  Croley was additionally charged with making a false report in violation of 18 U.S.C. § 1519 by making two false statements in a DCSO incident report.

[3] Griffin IV was acquitted of the sole count against him, and Croley was convicted of both counts against her.

[4] Croley has not appealed.

things, "knowingly . . . engage[] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  The term "misleading conduct" encompasses "knowingly making a false statement."  *Id.* § 1515(a)(3)(A).

For a conviction under § 1512(b)(3), "[w]e review challenges to sufficiency of the evidence *de novo* and assess the evidence in the light most favorable to the prosecution."  *United States v. Veal*, 153 F.3d 1233, 1253 (11th Cir. 1998), *abrogated on other grounds by Fowler v. United States*, 563 U.S. 668 (2011).  "We make all reasonable inferences and credibility choices in favor of the jury's verdict as we evaluate the evidence to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (internal quotation marks and citations omitted).

The indictment charged Umbach and Kines with knowingly making two false statements to Agent McDermond: (1) that Griffin IV did not use force against Parrish and (2) that the only person who hit Parrish was Kines.

Umbach first argues that he never actually told McDermond that Griffin IV did not use force against Parrish.  Instead, according to Umbach, he merely told McDermond what he personally was able to see, what he believed he would have seen, and what he thought was plausible.  Umbach contends that the government

13

read too far into Umbach's statements by construing them as conveying that Umbach believed Griffin IV did not hit Parrish.

Umbach's cramped semantic argument ignores the import of his actual words. Umbach told McDermond that he did not see Griffin IV hit Parrish and that he would have seen it if it did happen. The jury could have reasonably understood these statements as conveying, as a factual assertion, that Griffin IV did not hit Parrish. But that's not all Umbach told McDermond. Umbach also said that Griffin IV "actually never laid hands on [Parrish] until [Umbach and Kines] picked [Parrish] up," at which point Griffin IV simply escorted Parrish to a golf cart to be taken to the DCSO command center. Umbach even assured McDermond that "[he] could tell [McDermond] that one hundred percent." The jury could have rationally understood these statements as asserting, as a matter of fact, that Griffin IV did not strike Parrish.

Next, Umbach and Kines both argue that no evidence supports a finding that either of them had any knowledge of the fact that Griffin IV struck Parrish. We disagree. Umbach and Kines were on the ground not just next to Parrish, but in fact holding Parrish when Griffin IV came up to Parrish and struck Parrish's face multiple times with a flashlight. Any reasonable jury could conclude that, even under these rapidly evolving circumstances, Umbach and Kines knew that Griffin IV hit Parrish. Umbach indeed admitted that he would have seen Griffin IV strike

14

Parrish, had it occurred.  Umbach's argument now that "[s]uch a subjective self-assessment cannot sustain a conviction for making a false statement" cannot nullify his earlier statements assuring McDermond "one hundred percent" that his reporting of the events was accurate.  And even if it could, Umbach's purported "subjective self-assessment" is not the only evidence against Umbach.  Other evidence shows that Griffin IV beat Parrish and that Umbach was right next to Parrish when it happened.  That circumstantial evidence is enough for a jury to find that Umbach knew Griffin IV beat Parrish.

Umbach separately contends that his statements to McDermond were not intentionally misleading because, by using qualifying phrases such as "to my knowledge," he was telling McDermond only what he knew, and he was not speculating as to anything else that could have happened.  But as we have already explained, the jury was entitled to conclude, based on circumstantial evidence, that Umbach knew Griffin IV hit Parrish; it follows that the jury could have viewed Umbach's "to my knowledge" statements as intentionally misleading because Umbach was not in fact communicating everything that he knew.  And to the extent that Umbach told McDermond that he did not actually *see* certain things happen, the jury likewise was entitled to conclude that Umbach was lying about what he did in fact see and that therefore Umbach intentionally misled McDermond.

Finally, the jury was not required to conclude, as Kines suggests, that Kines's interview with McDermond happened so long after the BikeFest altercation that any irregularities in Kines's statements to McDermond were merely accidental. The record reflects that Kines spoke about the altercation to various people at various points in the chronology of this case and that material facts in Kines's account, such as whether Griffin IV was present and the type of force Kines used against Parrish, changed in significant ways over time. The jury reasonably could have viewed these repeated recitations as proof that Kines did indeed remember the BikeFest encounter during his eventual interview with McDermond. The jury also could have taken these changes in Kines's accounts as evidence that Kines intentionally fabricated the particular story that he ended up telling McDermond. Plus, we have noted that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (emphasis and footnote omitted).

Umbach and Kines offer no persuasive reason to question the jury's verdict, so we hold that the evidence at trial was sufficient to sustain their convictions.

## III.

Kines argues that a portion of the jury instructions regarding § 1512(b)(3) improperly favored the government. "Generally, district courts have broad

16

discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts . . . ." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (internal quotation marks and citation omitted). In reviewing a district court's jury instructions, "we will not reverse a conviction . . . unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.* (internal quotation marks and citation omitted). We review *de novo* the legal correctness of jury instructions but review the phrasing of the instructions for abuse of discretion. *See id.*

The jury instructions for the § 1512(b)(3) charge against Kines (and Umbach) provided, in pertinent part, as follows:

> To find Defendants Umbach and Kines guilty of Count Six and Seven respectively, in violation of 18 U.S.C. § 1512(b)(3), the Government must prove each of the following facts beyond a reasonable doubt:
>
> (i) That the Defendant knowingly engaged in misleading conduct toward another person, as alleged;
> (ii) That the Defendant acted with the intent to hinder, delay, or prevent the communication of the information alleged and that it was reasonably likely that the information would have been provided to a federal law enforcement officer or federal judge; and
> (iii) That the information related to the commission or possible commission of a federal offense.
>
> * * *
> The Government must show that the defendant acted with the intent to hinder, delay, or prevent the communication of truthful information, and that there was a reasonable likelihood that, absent the alleged conduct, the information would have been provided to federal law

17

enforcement authorities. In determining whether the defendant acted with the intent to hinder, delay or prevent communication of truthful information, you may consider whether the defendant acted with the purpose of preventing the transfer of truthful information to law enforcement officers or courts generally. This fact may be proven by evidence that the defendant acted with the purpose of preventing the transfer of truthful information to federal law enforcement officers or federal courts generally.

The Government is not required to establish that the defendant intended to keep truthful information from a specific federal law enforcement officer or a specific federal judge, or that the defendant knew that the persons from whom he intended to conceal truthful information were federal law enforcement officers or judges.

*In determining whether the defendant had the required intent, you should consider all the circumstances of the case, including, among other things, the following: (1) the defendant's knowledge, experience and training regarding permissible uses of force; (2) the defendant's knowledge, experience and training regarding the preparation of police reports; (3) whether the defendant knew that incidents of excessive force are investigated by federal authorities; and (4) any other circumstances as shown by the evidence which might assist you in determining defendant's knowledge and intent.*

Kines identifies what he perceives to be a number of discrete flaws in the italicized paragraph above.

First, Kines contends that the instruction to consider "whether the defendant knew that incidents of excessive force are investigated by federal authorities" is redundant because the preceding paragraph instructs the jurors that "[t]he Government is not required to establish that . . . the defendant knew that the persons from whom he intended to conceal truthful information were federal law

18

enforcement officers or judges."[5]   In Kines's view, this redundancy unduly emphasized the government's case.

But, in fact, the two purportedly problematic clauses are not redundant. True, "[t]he Government is not required to establish . . . that the defendant knew that the persons from whom he intended to conceal truthful information were federal law enforcement officers or judges." *See United States v. Chafin*, 808 F.3d 1263, 1273–74 (11th Cir. 2015).  But the jury nevertheless could take into account, in determining intent, whether Kines knew that McDermond was a federal law-enforcement officer and whether federal law-enforcement officers investigated incidents of excessive force.  The jury instruction that Kines challenges thus properly advised the jury that, even though the jury was not required to find a particular fact, the jury was not precluded from considering that fact in determining whether Kines possessed the requisite intent.  Put simply, the instruction was not an incorrect statement of the law.

Next, Kines contends that the instructions that the jury consider his "knowledge, experience and training regarding permissible uses of force" and "knowledge, experience and training regarding the preparation of police reports"

---

[5] Kines also notes that the district court omitted from the government's proposed jury instructions an instruction that "[t]he Government also does not have to show that the defendant knew the federal nature of the crime about which he engaged in misleading conduct."

19

are irrelevant to whether Kines made misrepresentations to McDermond during their interview. We disagree.

McDermond's interview was geared towards ascertaining a full and accurate account of what took place during Parrish's arrest at BikeFest, including whether any police misconduct occurred. If Kines understood the difference between permissible and impermissible uses of force, then the jury could have reasoned that Kines should have known during his interview with McDermond that he should have disclosed to McDermond that Griffin IV used potentially impermissible force against Parrish. And if he didn't, that circumstance would have removed a motive for Kines to have made false statements about Griffin IV's use of force. The same goes for Kines's understanding of police reports: if Kines knew how to prepare truthful and accurate police reports, then the jury could have surmised that Kines was deliberately deceiving McDermond when he gave McDermond a less-than-truthful-and-accurate account of what happened to Parrish during his arrest at BikeFest. On the other hand, if he didn't, Kines's misstatements may have been less telling.

Contrary to Kines's assertion, the challenged jury instructions did not improperly favor the government, as they neither "unduly emphasize[d] the theory of the prosecution, thereby deemphasizing proportionally the defendant's theory," nor did they "overemphasize the importance of certain evidence or certain parts of

the case." *United States v. McCracken*, 488 F.2d 406, 414 (5th Cir. 1974) (internal quotation marks and citations omitted).

## IV.

Kines raises multiple evidentiary objections as issues on appeal. The Court generally reviews a district court's evidentiary rulings for an abuse of discretion. *See United States v. Williams*, 526 F.3d 1312, 1319 (11th Cir. 2008). But "[e]ven where an abuse of discretion is shown, non-constitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." *United States v. Reeves*, 742 F.3d 487, 501 (11th Cir. 2014) (alteration in original) (internal quotation marks and citations omitted). "An error affects a defendant's substantial rights where it prejudiced him by affect[ing] the outcome of the district court proceedings." *United States v. Doyle*, 857 F.3d 1115, 1118 (11th Cir. 2017) (alteration in original) (internal quotation marks and citation omitted).

## A.

Kines argues that Nix was improperly allowed to give expert testimony about Griffin IV's use of force against Parrish, even though Nix was admitted as only a lay witness. More specifically, Kines objects to the government's asking Nix at trial whether, based on Nix's observations at the time of Parrish's arrest,

Nix had seen anything that "justified [Griffin IV's] use of force" against Parrish. In response to this question, Nix answered, "No, ma'am."

Under Federal Rule of Evidence 701, a lay witness may give testimony in the form of an opinion as long as the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Subsection (c) of the rule was added in the year 2000, and its purpose was to "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendments. Kines argues that the government succeeded in evading Rule 702's requirements by convincing the district court to admit Nix's challenged testimony even though that testimony was expert testimony subject to Rule 702 and not lay testimony subject to Rule 701.

In *United States v. Myers*, this Court held, well before the 2000 amendments to the Federal Rules of Evidence, that law-enforcement officers could, under Rule 701, give lay-opinion testimony regarding the reasonableness of force if the opinion was (1) "relevant to the determination of a fact in issue," (2) "rationally based upon [the officer's] personal perception," and (3) "rationally based upon . . . [the officer's] . . . experience on the police force." 972 F.2d 1566, 1577–78 (11th

Cir. 1992).  We reaffirmed *Myers* years later in *United States v. Novaton*, 271 F.3d 968, 1008-09 (11th Cir. 2001), and then reaffirmed both *Myers* and *Novaton* in the context of the 2000 amendments to the Federal Rules of Evidence in *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1220–23, 1223 n.17 (11th Cir. 2003).

A straightforward application of *Myers* and its progeny leads to the conclusion that the district court did not err in admitting Nix's testimony, given that it was based on only (1) Nix's personal observation of what happened between Griffin IV and Parrish at BikeFest and (2) Nix's prior training and experience.

**B.**

Kines also argues that the district court improperly admitted another part of Nix's trial testimony.  In particular, Nix testified that when he was in Croley's office at the DCSO with Croley and Cofer, the Sheriff stated, from the adjoining room, that the Sheriff preferred that Griffin IV not be included in the DCSO's incident report.  Kines argues that the district court improperly admitted this testimony because the Sheriff's statement would be admissible only as a coconspirator statement under Federal Rule of Evidence 801(d)(2)(E), but the government failed to prove the existence of a conspiracy.

The government, however, has expressly disavowed any reliance on the coconspirator hearsay exception for admission of Nix's testimony about what the

23

Sheriff said; the government contends instead that Nix's testimony regarding the Sheriff's statement is non-hearsay because the government "was offering the statement not for its truth (*i.e.*, that Sheriff Griffin really wanted the officers to leave his son out of the report) but simply to show why Croley left Griffin out of the report."[6]

By definition, a hearsay statement is (1) "a statement that . . . the declarant does not make while testifying at the current trial or hearing" and (2) "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Although Nix's testimony stated what someone else (the Sheriff) said, the district court properly admitted the testimony as non-hearsay offered to show the effect of the statement on Croley and not for the truth of the matter asserted. *See United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) ("Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay.").

Kines replies that testimony that the government subsequently elicited from DCSO Deputy Julian Crowder shows that the government had been relying on the Sheriff's statement, as told by Nix, for the truth of the matter asserted. In particular, Kines takes issue with the government's elicitation of testimony from Crowder that, on one of the days following BikeFest, Nix had told Crowder about the Sheriff's statement.

---

[6] The government also notes that the district court gave the jury a cautionary instruction after the challenged testimony was elicited.

24

Kines's argument fails.  The government did not rely on Crowder's testimony to prove the truth of the Sheriff's statement.  Instead, the government relied on Crowder's testimony as a prior consistent statement by Nix to rebut the defense's suggestion, developed during Nix's cross-examination, that Nix's trial testimony about the Sheriff's statement was recently fabricated in light of Nix's departure from the DCSO on less-than-amicable terms.  *See* Fed. R. Evid. 801(d)(1)(B)(i).  Crowder's testimony referred to a statement Nix made before his departure from the DCSO, so Crowder's testimony was properly admitted to show that Nix's testimony at trial about what the Sheriff said was consistent with what Nix had previously told Crowder about what the Sheriff said.[7]

## C.

At trial, Parrish testified that he filed a civil suit against the DCSO and its officers, including Kines, for money damages as redress "[f]or what they had done to [him]" at BikeFest.  The district court instructed the jury that it should take this testimony to assess only whether Parrish had any type of interest in testifying and whether that interest could affect his credibility.

Kines wanted to use allegations from Parrish's civil complaint to impeach Parrish because Kines thought a few of those allegations were inconsistent with

---

[7] We likewise reject Kines's contention that statements the government made during its closing argument showed that it was relying on Nix's statement for the truth of the matter asserted.

statements Parrish made in his trial testimony. But the district court prohibited that questioning. Kines now argues that was error because the questioning should have been allowed under either Federal Rule of Evidence 801(d)(2)(D) or Federal Rule of Evidence 613(b).

Rule 801(d)(2)(D) defines as "not hearsay" a "statement [that] is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Kines argues that Parrish's attorney in his civil suit was his agent and that the allegations of the complaint, having been drafted by the attorney-agent, are attributable to Parrish. By its plain language, however, Rule 801(d)(2)(D) applies to only admissions by agents of a party opponent. So the rule is inapplicable here since Parrish is neither a party to this case nor an agent of the government, which is the opposing party in this case. *See United States v. Pacchioli*, 718 F.3d 1294, 1305 (11th Cir. 2013) ("Fed. R. Evid. 801(d)(2) applies only to the agents of *party opponents* . . . ." (emphasis in original)); *United States v. Gossett*, 877 F.2d 901, 906 (11th Cir. 1989) ("The Government is the party opponent of both defendants.").[8]

Kines's argument based on Rule 613(b) is a tougher call. That rule provides, "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if

---

[8] For the first time on appeal, Kines asserts in his reply brief that Rule 801(d)(2)(C) also applies. Kines waived this argument by failing to assert it in his opening brief. *See United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999).

26

the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). Unlike Rule 801(d)(2)(D), Rule 613(b) is not expressly limited to statements by an opposing party's agent, and in fact, the rule states that it "does not apply to an opposing party's statement under Rule 801(d)(2)." *Id.*

The district court ruled against admissibility because the complaint was not verified by Parrish but was instead simply a complaint drafted by Parrish's attorney. The problem, as the district court saw it, was that an unverified complaint is not the equivalent of a sworn statement by the plaintiff, although a verified complaint is. So the question before us is whether the allegations of the civil complaint are Parrish's statements, and not merely his attorney's statements, for purposes of Rule 613(b).

No Eleventh Circuit precedent is squarely on point, and we do not resolve this issue of first impression today. Even if the district court erred in prohibiting Kines's questioning on this subject, the exclusion of this impeachment evidence did not prejudice Kines. According to Kines, the following aspects of Parrish's civil complaint conflicted with Parrish's trial testimony: (1) the allegation that Mark West and Mike Green "were intoxicated and resisted arrest"; (2) the allegation that Parrish "was hit with flashlights, punched and kicked by Defendants

27

Robert Wade Umbach, Christopher Kines and Wiley Griffin, IV"; and (3) the complaint's failure to mention the large African-American deputy who, according to Parrish's trial testimony, choked him.

The lack of any questions at trial about these allegations did not prejudice Kines. First, we note that the allegations are, at best, only somewhat inconsistent with certain statements Parrish made at trial. But even if they were completely inconsistent with some of Parrish's trial testimony, they do not bear on any factual issues central to Kines's conviction. Whether Mark West and Mike Green were intoxicated and resisted arrest makes no difference to Kines's witnessing Griffin IV's beating of Parrish and Kines's lying to McDermond about what happened. Similarly, the allegation that Parrish was "hit with flashlights, punched and kicked by" Umbach, Kines, and Griffin IV suggests Parrish was confused about who did what to him, but it could also be read as simply a jumbled, poorly drafted allegation that, at the end of the day, does not discredit all the other evidence showing that Kines saw Griffin IV beat Parrish with a flashlight and that Kines lied about it to McDermond. Finally, Parrish's failure to allege, as he testified at trial, that a large African-American deputy choked him likewise fails to call into doubt all the other evidence showing that Kines saw Griffin IV beat Parrish with a flashlight and that Kines lied about it to McDermond.

Separately, Kines argues that the district court should have permitted him to question Parrish about the amount of damages Parrish sought in his civil suit in order to show Parrish was a biased witness. But even if the court's ruling on this issue amounted to an abuse of discretion, the exclusion of this impeachment evidence also did not prejudice Kines. First of all, the jury knew about the civil suit and knew about the extent of Parrish's injuries, so the jury easily could have surmised that Parrish sought a significant sum from Kines and his codefendants—a circumstance that would suggest Parrish had a financial interest in the outcome of Kines's trial. And second, the evidence simply would have impeached Parrish with respect to a collateral issue that, again, would not have changed all the other evidence showing that Kines saw Griffin IV beat Parrish with a flashlight and that Kines lied about it to McDermond.

## D.

At trial, the government wanted to play excerpts from McDermond's audio-recorded interviews with Kines and Umbach, but Kines objected that the interviews should be played in their entirety, not merely in the form of select excerpts. The government responded that it could not play the recordings in their entirety because there were *Bruton* statements[9] in each of the recordings. The district court ultimately ruled that, under the rule of completeness, the government

---

[9] *Bruton v. United States*, 391 U.S. 123 (1968).

could play its excerpts, and then the defendants, who were in possession of the full recordings, could play whatever additional excerpts they wished to play and, in so doing, could account for the *Bruton* statements.

Federal Rule of Evidence 106 provides, "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." But "Rule 106 does not automatically make the entire document admissible. . . . It is consistently held that the rule permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Simms*, 385 F.3d 1347, 1359 (11th Cir. 2004) (alteration in original) (internal quotation marks and citation omitted).

Despite the court's ruling, Kines never sought to play any additional excerpts of his interview with McDermond. So all that the district court had to do was to decide whether to accept Kines's proposition to either play the entire interview or play none of the interview. The district court properly rejected this all-or-nothing proposition because "Rule 106 does not automatically make the entire [audio-recording] admissible." *Id.* (internal quotation marks and citation omitted). Instead, the burden was on Kines to identify additional portions of the

30

interview "to qualify, explain, or place into context the portion[s] already" played by the government. *Id.* (internal quotation marks and citation omitted).

Kines argues on appeal that "[t]he jury should have been permitted to hear his account of the altercation, and his explanation of the situation which he confronted prior to, during, and immediately after the altercation with Mr. Parrish." But Kines still does not identify the portions of the interview to which his side of the story corresponded; moreover, even if he did so now, Kines has not properly preserved this argument for appellate review because he failed to identify his select portions of the interview for the district court. *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336–37 (11th Cir. 2017) (explaining that a party seeking to raise an argument on appeal must first present it to the district court in a manner that allows the court "an opportunity to recognize and rule on it" (internal quotation marks and citation omitted)).

### E.

McDermond's testimony at trial centered in large part on showing that Kines made misrepresentations to McDermond about what happened to Parrish at BikeFest. To that end, the government introduced, and the district court admitted, a two-page excerpt from the transcript of Kines's testimony at Parrish's state-court criminal trial. The excerpt showed that, at the prior trial, Kines testified that the force he used to subdue Parrish consisted of four or five strikes at pressure points.

31

This differed from both Kines's DCSO witness statement and Kines's statements to McDermond during their interview months later.

On cross-examination of McDermond, Kines attempted to introduce four additional excerpts of his testimony from the state-court trial:   (1) Kines's extensive account of what happened both before and during his altercation with Parrish; (2) Kines's statement that "all this happened within probably ten or 15 seconds"; (3) Kines's statement that "all this happened in . . . a matter of seconds"; and (4) Kines's explanation that the incident report he drafted was "a summary," given that he "wasn't the investigating officer."  The government did not object to the fourth excerpt because, as the government saw it, that excerpt fell within the scope of McDermond's testimony on direct.

But the government did object to the first three excerpts because those excerpts were Kines's statements from the state trial.  Since Kines was not himself testifying in the federal trial, the only basis for admitting Kines's own statements would have been the rule of completeness, but that rule was not satisfied because none of the three objected-to excerpts fell within the scope of McDermond's testimony on direct.  The court ruled that, on cross-examination of McDermond, the defendants could introduce excerpts that related to McDermond's testimony on direct, but if the defendants wanted to introduce excerpts outside of that scope, they would have to wait until their time came to present their own case.  Later,

during the defense's case, Kines again sought to introduce the three excerpts. The government objected, and the court sustained on the ground that the excerpts were Kines's testimony from the state-court case but Kines was not testifying in this case.

On appeal, Kines argues that the district court should have admitted the excerpts because, as we held in *United States v. Williams*, 59 F.3d 1180, 1184 (11th Cir. 1995), "generally statements made under oath in a prior trial by a criminal defendant who then waived his constitutional right are admissible in a subsequent trial." But Kines reads this rule out of context. In *Williams*, we found a criminal defendant's prior trial testimony to be admissible in a subsequent trial, even though the defendant did not testify in that subsequent trial, when the testimony was being offered by the government against the criminal defendant. *See id.* Indeed, the Supreme Court case we cited for this rule, *Harrison v. United States*, 392 U.S. 219 (1968), stated that "a defendant's testimony at a former trial is admissible in evidence *against him* in later proceedings." *Id.* at 222 (emphasis added).

In Kines's case, however, the government was not offering the three excerpts from Kines's prior testimony against Kines; rather, Kines was attempting to use his own prior testimony to impeach a government witness. Under these different circumstances, the rule from *Williams* and *Harrison* does not apply. We

therefore hold that the district court's exclusion of Kines's excerpts from his prior trial testimony provides no basis for reversal of Kines's conviction.[10]

**F.**

Kines argues next that the government should not have been permitted to call two witnesses, Robbie Lynn Webb and Julian Crowder, in rebuttal.  The "purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party, and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge."  *United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) (en banc) (internal quotation marks and citations omitted).

We start with Webb.  Before the government began its rebuttal, it explained its limited purpose in presenting Webb's testimony.  Specifically, the defendants developed a theory in their case that, the morning after the altercation, blood was observed on the hitch of a trailer right next to where the altercation took place, which suggested that Parrish sustained his injuries by falling onto or otherwise bumping into the trailer hitch.  The government told the court that Webb's

---

[10] Kines also argues that it is "fundamentally unfair to allow the government to select portions of a witness' testimony, as this allows that testimony to be taken out of context and misinterpreted."  Other than a footnote that cites *United States v. Leon-Reyes*, 177 F.3d 816, 820 (9th Cir. 1999), a Ninth Circuit decision regarding Federal Rule of Evidence 1006, Kines cites no authority in support of this additional argument.  And because Rule 1006, which governs "use [of] a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs," is plainly inapposite, Kines waived this additional argument by failing to sufficiently develop it with legal authority.  *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1196 (11th Cir. 2004).

testimony would describe how he saw Parrish get injured in a manner that did not involve the hitch.  Kines objected that the defense introduced no evidence suggesting that the hitch caused Parrish's injury but merely introduced evidence that one witness saw blood on the trailer hitch the morning after the incident, which prompted him to contact the DCSO.  The court overruled Kines's objection and allowed Webb to testify that he saw Griffin IV hit Parrish in the face.

The district court properly allowed Webb to testify in rebuttal in order to counteract the defense's theory that Parrish's injuries were caused by the trailer hitch rather than by Griffin IV's flashlight.  Contrary to Kines's disavowal, the defense did indeed promote this theory during its case at trial, with testimony elicited from three different witnesses.

The district court also properly allowed the government to question Crowder as a rebuttal witness.  To explain why, we must go back to the government's case-in-chief, during which Nix testified, on direct examination, that he heard the Sheriff say that he preferred that Griffin IV be left out of the incident report.  Later, on cross-examination, Nix also stated that he voluntarily resigned from the DCSO around March 2013 after Cofer was promoted to undersheriff, which Nix took as a sign that he would soon be demoted and fired if he did not leave on his own.  Nix explained that he felt this way because he had previously worked under Cofer,

their relationship was hostile, and he would rather not work at the DCSO than work under Cofer again.

Still during its case-in-chief, the government called Deputy Emanuel as a witness. On direct examination, the government attempted to elicit prior-consistent-statement testimony from Emanuel that Nix had told Emanuel that the Sheriff had said he preferred to have Griffin IV left out of the incident report. But the court sustained the defense's objection and ruled that, although the time was not yet ripe for such testimony, the government could raise the issue again later.

When the time came for the defense's case, the defense ended up calling three different witnesses, among them Crowder, who testified, on direct examination, that Nix had an untrustworthy character. During Crowder's cross-examination, the government tried to elicit a prior consistent statement that Nix had told Crowder that the Sheriff indicated his preference for leaving Griffin IV out of the incident report. But the court did not allow that line of questioning because it exceeded the scope of Crowder's direct examination, which dealt with Nix's character for truthfulness. Nevertheless, the court did state that the government could address the matter again at an appropriate time.

Consequently, the government decided to call Crowder as a rebuttal witness. But before doing so, the government explained to the court that Crowder's testimony would be limited to rebutting the defense's implication, developed on

36

cross-examination of Nix, that Nix's testimony about the Sheriff's statement regarding the incident report was recently fabricated because, ever since Nix left the DCSO on less-than-amicable terms, Nix had a motive to sabotage the DCSO. In other words, the government offered to have Crowder testify as to a prior consistent statement that Nix made to Crowder long before Nix left the DCSO. As a result, Crowder's testimony would show that the statement Nix made at trial after leaving the DCSO was consistent with a statement he made before leaving the DCSO.

Kines objected that the government should have addressed this issue during its case-in-chief. The government responded that it tried to do so with Emanuel, but the court precluded Emanuel from testifying about Nix's prior consistent statement because the time was not yet ripe for prior-consistent-statement testimony. The government also tried to obtain similar testimony on cross-examination of Crowder in the defense's case, but the government was precluded from doing so then as well.

So when the time came for the government's rebuttal and the government offered prior-consistent-statement testimony, the government thought it was following the court's directive to save prior-consistent-statement testimony for later; the only difference in approach the government took in rebuttal was that it presented testimony from Crowder instead of testimony from Emanuel. The court

37

allowed Crowder to testify, acknowledging that the court prevented the government from exploring the issue during its case-in-chief.

On appeal, Kines renews his argument that the government should have called Crowder during its case-in-chief and that none of Crowder's testimony in rebuttal was within the scope of what was presented by the defense during the defense's case. We hold that, while the government arguably could have presented Crowder's testimony during its case-in-chief, the district court did not abuse its discretion in allowing the government to present this evidence in rebuttal after (1) the court effectively precluded the government from doing so in its case-in-chief and (2) the manner in which the defense presented its case also precluded the government from raising the issue.

## G.

During deliberations, the jury asked to re-listen to the excerpts of the audio-recordings of Kines's and Umbach's interviews with the FBI that were played during trial. The court allowed the excerpts to be played over the defense's objection. Kines argues on appeal that the replaying of the excerpts during jury deliberations placed undue emphasis on that evidence. Circuit precedent, however, allows a jury to re-listen to audio evidence that was played during trial as long as the court takes adequate precautions to ensure that the evidence is not unduly emphasized when replayed. *See United States v. Zepeda-Santana*, 569 F.2d 1386,

38

1391 (5th Cir. 1978); *United States v. Alfonso*, 552 F.2d 605, 618–19 (5th Cir. 1977).

Here, the court took the following precautions: it instructed the jurors that they were required to remember all of the evidence and not just the part being replayed; the court did not allow the transcripts of the recordings to be shown in tandem with the recordings; and the court simply replayed for the jurors the excerpts a single time in the courtroom and did not allow the jurors to take the recordings back into the jury room. The court could have taken the additional precaution, suggested by Kines, of also replaying certain parts of McDermond's cross-examination, but that would have been more appropriate if the court had been replaying parts of McDermond's testimony on direct, which the court did not do. All things considered, we hold that the district court acted within its discretion in allowing the recordings to be replayed.

## V.

Kines argues that he is entitled to a new trial due to cumulative error. "Under the cumulative-error doctrine, we will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). The only error that Kines has come close to establishing is the district court's prohibition of questioning regarding certain allegations Parrish made in his civil

39

complaint.  We have already ruled, however, that, even if that prohibition were error, it was harmless.  Kines has not established that the district court committed any other trial error beyond that one potential error, so we reject Kines's assertion that cumulative error infected his trial.

## VI.

The final issue we must consider in this appeal is raised by both Kines and Umbach: they argue that the district court erred in enhancing their offense levels by two points for abusing a position of trust pursuant to U.S.S.G. § 3B1.3.[11]  That sentencing provision states, "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. . . ."  U.S.S.G. § 3B1.3.  "For the adjustment to apply, the government must establish both elements: (1) that the defendant held a place of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense." *United States v. Ward*, 222 F.3d 909, 911 (11th Cir. 2000).  "While the district court's factual determination that a defendant abused a position of public trust is reviewed for clear error, its conclusion that the defendant's conduct justifies the abuse-of-trust enhancement is a question of law that we review *de novo*." *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998).

---

[11] The court employed the 2015 Guidelines Manual, effective November 1, 2015.

On appeal, Umbach, Kines, and the government all agree (as they did before the district court) that neither Umbach nor Kines should have received the abuse-of-trust enhancement.  As the parties see it, no evidence shows "that Kines or Umbach *abused* their positions as police officers (or, in Umbach's case, as a former police officer) to 'significantly facilitate[]' the commission of the particular offense for which they were convicted . . . ."  In light of the parties' stipulation, we vacate Umbach's and Kines's sentences and remand this case for resentencing without application of the abuse-of-trust enhancement.

## VII.

For the foregoing reasons, we **AFFIRM** the Appellants' convictions, **VACATE** the Appellants' sentences, and **REMAND** for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**